Charles B. BURKE, C. L. Gibson, Beulah V. Gibson and Ann L. Galbreath, Plaintiffs-in-Error,

v.

Mathew M. DONNERMEYER and Berna Mae Donnermeyer, Defendants-in-Error.

No. 41956.

Supreme Court of Oklahoma.

Dec. 17, 1968.

Ogden & Ogden, by Charles R. Ogden, Guymon, for plaintiffs in error.

Keith Drum, of Lansden, Drum & Goetzinger, Beaver, for defendants in error.

BLACKBIRD, Justice:

This appeal involves an action, whose effect was nullification of the sale and/or transfer to defendants in error, Mr. and Mrs. Donnermeyer (hereinafter referred to by name, or as "plaintiffs") by the plaintiffs in error, C. L. and Beulah V. Gibson,

husband and wife, and one Anna L. Galbreath, of a business property in Guymon, known as the "Oklahoman Motor Hotel", and the rescission of the contract for said transfer.

Previously, the owner of the motel buildings and lots, Intri-State Investment Company, had leased said realty (under a so-called "lease-purchase agreement") to one, Garner, in December, 1963, for a long term, with an option, at the end of the term, to purchase the property for $100.00. The property consisted of a motel and restaurant in one building, and a so-called "Private Club" (for eating and drinking) in an adjacent, but separate building. The two eating places had separate kitchens.

Garner operated the motel only a few months before selling it, and assigning his rights, in the above-mentioned lease-purchase agreement, to the Gibsons and Galbreath, in August, 1964. A Midwest City real estate broker, named "Drake", of Western Motel Brokers, handled the transaction. In connection with this change of ownership, Garner furnished the new operators the original, or a copy, of the business's property and equipment inventory, that had been given to him when he had gone into possession, seven or eight months previously. Listed on the inventory were linens being used in the business, when Garner acquired it. However, those linens were no longer in the motel, for when they wore out, Garner had started renting other linens from an Amarillo concern. A kitchen range and steam table, used in the club kitchen, did not appear on the inventory.

After operating the business a few months, the Gibsons and Galbreath decided to sell it, and so notified the broker, Drake, who listed it with a Nebraska real estate agent, the plaintiff in error, Burke, who did business under the name of "Burke Realty Company."

Burke was acquainted with Mr. and Mrs. Donnermeyer, who were residents of North Platte, Nebraska, and had owned and operated a motel, without a restaurant, in that State for two years, before selling it.

When Mr. Donnermeyer asked Burke if he knew of another motel he and his wife could acquire, Burke then informed him of the Oklahoman's availability, and Donnermeyer evidenced sufficient interest in its purchase to accompany Burke on a motor trip to Guymon, during the latter part of October, 1964, to see this establishment. During their stay at the Oklahoman, Mr. Donnermeyer made it known that his wife would have to see, and approve, any motel he and she purchased, and that she would not want to operate a restaurant.

On Mr. Donnermeyer's second trip to Guymon, Mrs. Donnermeyer accompanied him and they drove from their Nebraska home to Dodge City, Kansas, where they left their children in Mrs. Donnermeyer's sister's home there, met Burke, and he transported them in his car the rest of the way to Guymon. On their way back, when they stopped at the sister's home again, a form of contract entitled: "UNIFORM PURCHASE AGREEMENT", was drafted, and the Donnermeyers signed it there on November 1, 1964. Under the terms of the contract, the Donnermeyers delivered to Burke $4,500.00 by check, as an escrow deposit on the property's purchase price, and therein agreed that they would pay an additional $23,500.00, assume the obligations of the lease-purchase agreement calling for payments totalling $274,000.00 over the period of said agreement's long term, and execute a note to Garner in the amount of "approximately $19,950.00". At the Donnermeyers' request, Burke wrote into the form of said agreement that it was to include "all furniture, fixtures and equipment *now considered part of the business. Full inventory to be furnished upon acceptance of this proposition * * *"*. (Emphasis added). The agreement also provided that the property was to be conveyed " * * * clear of all encumbrances, liens, or special taxes except those of record * * *".

Thereafter, the Donnermeyers returned to Guymon, and, under the terms of a "SUPPLEMENTAL AGREEMENT"

with the Gibsons and Ann Galbreath, making various changes and additions to the then existing Uniform Purchase Agreement, went into possession of the Oklahoman Motel as of 12:01 A.M., November 15, 1964, though it was the next day before the transaction was completed by the assignment of the leasehold interest to them, by their assumption of the payments prescribed in Garner's promissory note of $21,890.00 from the Gibsons, and by their delivery of their check to Burke for $25,272.61 in payment of the above mentioned $23,500.00, and other items listed in a "closing" statement. From the proceeds of this check, Burke disbursed $5,000.00 to Garner to pay delinquent installments on the Gibson note, another $5,000.00 to Drake, as his real estate broker's commission, another $5,000.00 to himself foɪ a broker's commission, and the balance to the Gibsons and Galbreath. The Supplemental Agreement also provided:

"* * *

It is stipulated that Assignors have been prepaying One Hundred Fifty Dollars ($150.00) per month to be applied against ad valorem taxes, real and personal, which is hereby assigned to Assignees and Assignees shall be responsible for ad valorem taxes, real and personal, payable after this date. * * *."

The only inventory of the motel property's "furniture, fixtures and equipment" that was ever furnished the Donnermeyers was a copy of the aforementioned original one that Garner had obtained when he purchased the motel property, almost a year previously, as aforesaid.

After going into possession of the motel property, plaintiffs were unable to lease the restaurant facilities to Mr. Dale Mahan, who was the establishment's chef at the time they agreed to buy the property, with the understanding, according to Donnermeyer's testimony, that if they made the purchase, Mahan would take over operation of said facilities under such a lease.

In January, 1965, a delinquent tax notice was issued on the property. On April 8, 1965, Arnholz Coffee Company, which had supplied the motel with its private club's steam table and kitchen range, repossessed them.

On April 26, 1965, the Donnermeyers, as plaintiffs, filed their petition (as the initial pleading in this action) against the parties appearing here as plaintiffs in error, but hereinafter referred to by name, or as "defendants". About this same time, Garner and his wife filed a separate district court action against the Donnermeyers asking, among other things, that a receiver be appointed for the motel property.

By an amended petition, plaintiffs thereafter filed in the present action, they sought court nullification of the lease-purchase agreement's assignment to them from the Gibsons, as well as a money judgment totalling $52,466.61, which included a total of $21,028.32 they had allegedly paid Intri-State Investment Company in periodic installments under said lease-purchase agreement, and the nearly $30,000.00 they had paid defendants upon going into possession of the motel property, as well as the sum of payments in the amount of $1,665.68 that they had allegedly paid on the Gibsons' note to Garner since that time. As their cause of action for the judgment thus prayed for, plaintiffs included allegations to the effect that defendants had falsely represented the personal property and equipment they owned in connection with the motel's operation, that they had led plaintiffs to believe was included in their purchase of the motel, referring particularly to the steam table and kitchen range that had been repossessed, as aforesaid. Plaintiffs' allegations also contained a reference to the fact that the defendant Burke had never furnished them a current, up-to-date, or correct, inventory of such motel property, as he had agreed to do in the uniform purchase agreement. Plaintiffs further alleged, in substance, that defendants had falsely represented to them that they had been pre-paying taxes on the motel's property into a fund, which, by the hereinbefore quoted supplemental agree-

ment, they purported to assign to plaintiffs. Plaintiffs further alleged, in substance, that when they agreed to purchase the property, the defendant, Burke, had falsely represented that he had procured "Dale Mahan, a party interested in subleasing the restaurant, in the above described premises." In said pleading, plaintiffs offered to tender back to defendants "anything of value" that they had received under the lease-purchase agreement's assignment.

To plaintiffs' amended petition Burke filed an amended answer separate from the one filed by the other defendants. Both pleadings contained qualified, general, denials, accompanied by special denials that said defendants made any false, or fraudulent, representations that were designed to, or did, induce plaintiffs to enter into their agreement to purchase the motel property. Defendants further alleged that in the aforementioned other district court action then pending against the plaintiffs, Mr. Garner and his wife were asking termination of the lease-purchase agreement's assignment involved in this action, because of plaintiffs' default thereunder, and therefore that " * * * the tender back made by plaintiffs fails * * * ".

Before trial of the present action, a jury was empanelled to serve its usual purpose in causes of equitable cognizance, and following the overruling of challenges to the sufficiency of the evidence and motions for judgment and/or a directed verdict by both plaintiffs and defendants, the cause was submitted to it, under instructions from the court. A general verdict for plaintiffs was thereafter returned, and (as evidenced by a minute entered on the trial docket) "accepted by the court" in October. During the next month, there was filed in the cause a document entitled "FINDING OF FACT AND CONCLUSION OF LAW", which, in words and figures, is as follows:

"The sole question to be determined in the trial of this cause was, whether or not the contract or assignment should be rescinded.

"FINDING OF FACT

"The jury was instructed that each element of fraud must be proven and that all of them must be found to exist; the absence of any of them was fatal to recovery.

"The Court finds as follows:

"(1) One stove and steam table and certain linens located in said motel at the time of the lease purchase agreement *were considered a part of the furniture and equipment and a part of the business* in the operation of the said Oklahoma Motel Hotel *and said Motel had a good and merchantable title* to said named equipment when in truth and in fact the *stove and steam table were encumbered and later re-possessed and that the linens in said establishment at the time of purchase were the property of another and being used therein by a contractural relationship.*

"(2) That the method or manner of arrangement for prepayment of certain taxes were expressed or represented to plaintiff and said explanation resulted in misunderstanding and misapprehension on the part of the plaintiff. Eventually, however, in this particular the plaintiff suffered no loss or detriment.

"(3) That a full inventory was not furnished upon acceptance of the proposition of the seller by the plaintiff herein.

"(4) That plaintiff, when discovering all the facts in a timely manner, offered to rescind when he became aware of his right to do so and said plaintiff offered to restore to the other parties everything of value which he had received under the agreement.

"(5) In fairness to the factual situation and to the record, this observation is made: It is difficult to conceive of an individual who testified that the lease or letting of the res*tu*rant involved was one of the most vital features in his

decision as to the purchase or lease of such properties, to not so much as discuss the lease or letting of said restaurant while the opportunity was afforded and while the prospect, a Mr. Mahan, was in his immediate presence to the extent at the very least having some tentative understanding or arrangement in the event he should consummate the transaction. His admitted conduct and oral testimony in this one particular, which he contended was such a vital one in his decision to acquire the assignment, falls short of being convincing or satisfactory to the court.

### "CONCLUSIONS OF LAW

"The question confronting the court is whether the conduct of defendants under all the circumstances amount to fraud and was of a character to entitle plaintiff to rescission.

"(1) A partial failure of performance of agreement or contract is grounds for rescission when such failure defeats the object of the agreement or when it concerns a matter of such importance that the contract or agreement would not have been made if default or failure to deliver in that particular had been expected or contemplated.

"(2) Section 233, Title 15 O.S.1961, authorizes a party to a contract or agreement to rescind if his consent to the contract or agreement is obtained through fraud of the other contracting party; and under sub-paragraph 2 of Sec. 233, a contracting party is authorized to rescind (if through the fault of the party as to whom he rescinds, the consideration for his obligations fails in whole or in part.

"(3) Section 235, Title 15 provides a party rescinding must exercise reasonable diligence to comply with the following rules:

"(a) He must rescind promptly, upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability, and is aware of his right to rescind.

"(b) He must restore to the other party everything of value which he has received from him under the contract; or must offer to restore the same, upon condition that such party shall do likewise, unless the latter is unable, or positively refuses to do so.

"(4) When fraud is alleged, it must be proven by clear, cogent, convincing, positive and satisfactory evidence, which preponderates to a degree of overcoming all opposing evidence and repelling the presumption of good faith.

"(a) The jury was so instructed and found by its verdict that the evidence in the case met this requirement.

"(b) The court makes such finding.

"(5) The plaintiff is ordred to restore to the defendants everything of value which he has received from them under the assignment.

"The verdict of the jury is this day adopted as judgment of this court.

"Dated this 12th day of November, 1965." (Emphasis added).

After the overruling of one motion for new trial by the defendants Gibson and Galbreath, and another one by the defendant Burke, all of these defendants jointly perfected the present appeal. Defendants' arguments for reversal are set forth under six propositions appearing in their brief, but we consider it unnecessary to deal with all of them.

Under their Propostions II, IV and V they attack the court's judgment and finding of fact "(1)", with reference to the hereinbefore mentioned motel linens, and repossessed stove and steam table, as being insufficiently supported by the evidence, and further argue, in substance, that the court erred in its application of well-established principles of law to the evidence in this case.

To deal with defendants' arguments to the effect that the record fails to show, by any clear, cogent and convincing evidence, that they made fraudulent representations about the stove, steam table and linens, that was material to, or induced, or was relied upon by, plaintiffs in their purchase of the subject motel property, it is appropriate to make specific references to the evidence. Though it may be perceived from the trial court's hereinbefore quoted finding of fact "(1)", that he was evidently of the opinion that the stove, steam table, and linens came within the category of "fixtures and equipment now considered part of the business", which the Uniform Purchase Agreement represented (as hereinbefore shown) would be included in the sale, it will be remembered that this Agreement was not fully drafted, nor executed by plaintiffs, nor their offer to buy the property made, until they had been to Guymon to inspect it. The agreement itself shows that, by signing it, plaintiffs committed themselves to the following provision contained therein:

"This offer is based upon my (our) personal inspection or investigation of the premises herein described and not upon any representation or warranties of conditions made by the seller or his agent."

Neither Mr. nor Mrs. Donnermeyer testified that anyone ever mentioned the stove, steam table, or linens during their viewing of the property, or at any time prior to December (about a month after they got possession of, and started operating, the motel property) when, according to Mr. Donnermeyer's testimony, they received a statement from Arnholz Coffee Company that there was "approximately $1200.00" due it on the steam table and kitchen range. On the other hand, Mr. Burke testified that, before the Donnermeyers signed the Uniform Purchase Agreement, he told them there were some things on the premises, including the range and steam table, that were not included in the inventory, and that Mr. Gibson also told him in his (Burke's)

presence. When Mr. Gibson testified, he corroborated this, and he went on to explain that the reason that they were not on the inventory Mr. Garner had furnished him and his associates, at the time of their previous purchase of the property, was that somebody purchased them after the motel first began operation. He further testified that after he and his associates took over the motel, they would get bills from Arnholtz Coffee Company (which he believed were addressed to a "Bill Tomlin") but they always sent them back; and that: "We didn't need the stove and wasn't going to pay them out."

Mr. Gibson also testified that, as soon as plaintiffs took possession, and assumed operation, of the motel, he and his wife took a trip to California to visit her parents and were gone about three weeks before returning to their home in Midwest City, where they found their final bill for motel telephone service forwarded to them, by mail, from Guymon. Gibson further testified that, to reach a proper settlement of this bill, he and his wife drove to Guymon "about the 15th of December" and had lunch with plaintiffs at the Oklahoman. This witness further testified that, on this occasion, the only complaint plaintiffs made was that there were only forty television sets in the motel, instead of forty-two, like they understood there would be. Gibson further testified that, in answer to this, he referred plaintiffs to the inventory they had, which showed only forty of these sets. Gibson further testified that, when he and his wife were there, Mr. Mahan was still employed, and that only the kitchen in the motel was being operated, any food sold in the club being catered from that kitchen.

The above witness's testimony was substantially corroborated by his wife, who further testified that she took Mrs. Donnermeyer through the motel kitchen (on the latter's inspection tour) and that the kitchen range and steam table were among the items that she told her, "don't go with the

motel * * *"; and that she also told her about the linens.

Mr. Garner, another of defendants' witnesses, now of Garden City, Kansas, testified that he came to Guymon in February (1965) to find out why plaintiffs were "running late" in their installments on the motel property's lease-purchase agreement, and that Mr. Donnermeyer told him he "didn't have any money at that time."

From that part of the undisputed testimony above referred to, showing that plaintiffs learned as early as December, 1964, that the kitchen range and steam table were not paid for, and were not owned by the Gibsons and Ann Galbreath at the time the purchase of the motel property was agreed upon, or consummated, it is passing strange that they waited more than 3 months—until these articles were repossessed in April, 1965—before making any claim, or complaint, that they had been mislead, or defrauded, concerning the fixtures and equipment included in their purchase of the motel property, or in their agreement to do so. We think the evidence is such that it might reasonably be inferred therefrom that the real reason they brought the present action was to enlist court aid in retrieving a disappointing business investment they had made. We think that if the statute referred to in the trial court's hereinbefore quoted conclusions of law had been properly applied to this uncontradicted evidence, the result would have been unfavorable to plaintiffs. As the record stands, the only possible basis for the trial court's conclusion in its finding of fact "(1)" that the stove and steam table, and certain linens, in the motel at the time of the purchase agreement, "were considered a part of" the furniture and equipment and business in the operation of the motel (within the meaning of the Uniform Purchase Agreement) was the circumstance that these articles were there, and/or were being used, and plaintiffs' testimony to the effect that defendants did not mention them in naming the articles that did not go with the purchase.

Nor do we think the evidence justified rescission of the purchase agreement, or contract, on the ground of partial failure of performance. If plaintiffs regarded the fact that their vendors did not, or could not, transfer, to them title to the kitchen range, steam table, and linens, important enough that they would not have agreed to purchase the motel property, had they known these items would not be included in it, they were so long in arriving at such a conclusion as to suggest this was an afterthought. As hereinbefore indicated, the evidence suggests that when plaintiffs first looked at the property, their principal concern with reference to the motel's dining facilities was in not having to operate them personally, or directly. It is remembered that the previous experience they had had in operating a motel was with one that did not have such facilities; and Mrs. Donnermeyer was apprehensive about purchasing one *with* them. The evidence does not support the conclusion that acquisition of the motel's kitchen and dining room was the principal object of plaintiff's purchase of, or agreement to purchase, the motel property, or that the fact that the range lacked $1200.00 of being paid for, and that the steam table, and motel linens, were not part of said property, constituted a material breach of the parties' Uniform Purchase Agreement, or constituted material failure in the consideration for same. In Creach v. Homeowners Loan Corporation, 191 Okl. 484, 131 P.2d 108, we affirmed a judgment, on a directed verdict, denying defendants a rescission of an executed contract for the purchase of realty, where no material breach of it was proved, and defendants had continued in possession of the realty, without any prompt attempt to rescind it. And, this court, and other courts, have refused rescission of other kinds of contracts, after they had been substantially performed. See Collins v. Baldwin, Okl., 405 P.2d 74, and other cases digested in 4 Okl.Dig., "Contracts", ⚖261(1), (2) and (4). Also notice 91 C.J.S. Vendor & Purchaser § 110d, footnote 64, 17 Am.Jur.2d,

"Contracts" § 395, p. 841, and 155 Am.Jur., "Vendor and Purchaser", sec. 290.

Besides testifying that when Mr. Burke and Mr. Donnermeyer brought her to Guymon to see the Oklahoman, Mrs. Donnermeyer stated that she wasn't interested in the motel's restaurant, defendants' witness, Betty Jean Larke, who worked in the restaurant and helped Mrs. Gibson keep its books, further testified that she told Mr. Burke the restaurant and club were "not making ends meet on expenses." The defendant, Burke, testified, without contradiction, that he apprised Mr. Donnermeyer of this. The defendant, Ann Galbreath, who testified, on cross examination, that she was in the restaurant business "about 14 years", also testified that a restaurant in a motel does not make money, and added: "If it holds its own, you are doing good." (The evidence as to plaintiffs' experience with the one here involved seems to bear out this statement). As to the linens, the defendant Gibson's testimony indicated, without contradiction, that it is cheaper to pay the Amarillo linen service to furnish the motel clean linens @ seven cents per pound, than for the motel to maintain its own linens.

We concur in the trial court's apparent conclusion that the evidence was insufficient to support plaintiffs' allegations to the effect that the defendant, Burke, had falsely represented to plaintiffs that he had procured Mr. Mahan to sub-lease the restaurant from them, if, and after, their purcase of the motel property.

Nor do we think the evidence supports plaintiffs' claim of defendant, Burke's, failure to furnish plaintiffs an up-to-date inventory of the motel property, as a ground for the relief afforded them by the trial court's judgment. In our opinion, plaintiffs waived such failure, when they consummated the transaction, apparently without mentioning, or complaining of, the absence of such an inventory.

The evidence in this case established no separate cause of action against Burke, unrelated to plaintiffs' cause of action against the other defendants, that would justify the trial court's judgment. The only such allegation in plaintiffs' pleadings was that Burke's commission was illegally collected, because he was not licensed as a real estate broker in Oklahoma. The evidence shows, however, that Burke was associated with Drake, who is licensed in Oklahoma. Under our statute, Tit. 59, O.S.1961, § 852, Burke was entitled to a commission. See Bell v. United Farm Agency, Okl., 296 P.2d 149.

As herein indicated, it is our opinion that the trial court's findings of fact "(1)" and "(4)" are not supported by the evidence. It is our further opinion, from the evidence, that the parties' contract was substantially complied with, and that, if defendants were guilty of any breach of it, such breach was not a material one, further that plaintiffs did not act promptly in attempting to rescind the contract upon discovering such breach, and the evidence fails to establish any valid excuse for their delay. It is our further opinion that the record does not establish, by clear, cogent and convincing evidence that the plaintiffs were induced to enter into, or to comply with, the contract, by fraud on the part of the defendants. We therefore hold that the judgment of the trial court is clearly against the weight of the evidence, and represents a misapplication of our statutes and previous decisions to the preponderance thereof.

In accord with the foregoing, the judgment of the trial court is hereby reversed, and this cause is remanded to said court with instructions to vacate said judgment and enter judgment for the defendants.

JACKSON, C. J., IRWIN, V. C. J., and WILLIAMS, BERRY, HODGES, LAVENDER and McINERNEY, JJ., concur.